IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NO.: 9:21-cr-00317-DCN |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| EARL DAWSON CALDWELL, IV | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
COMPEL PRODUCTION OF GRAND JURY TESTIMONY**

The Defendant, Earl Dawson Caldwell, IV, has filed a motion to compel the Government to produce the Grand Jury transcript in his case. The Defendant has failed to meet his burden of proof to compel the production of the grand jury testimony, and the Government therefore opposes the motion.

**FACTS[1]**

Background Investigation

On April 30, 2021, the Hardeeville Police Department (HPD) began an investigation involving a seventeen-year-old minor possibly being the victim of human trafficking in Hardeeville, South Carolina. Information regarding the minor was provided to HPD by the Chatham Division of Family and Children Services and Memorial University Children's Hospital in Savannah, Georgia.  Memorial University Children's Hospital had treated the minor for a medical condition and while being treated, the minor made statements to the staff that she was

---

[1] The facts contained within are derived from reports produced by law enforcement involved in the investigation of this case, testimony of HSI Agent Ken Hawsey, videos of the minor's three recorded forensic interviews, evidence obtained from search warrants executed in this case, and the proffers of both co-defendants, Mills and Riley.

1

being forced to engage in commercial sex, which hospital staff reported to the human trafficking hotline.

Specifically, it was reported the minor was possibly being sexually trafficked by two men who were present at the hospital with her, and that the minor was addicted to crack cocaine, involved in prostitution, and living out of Room 260 at the Days Inn in Hardeeville, South Carolina. Hospital staff identified the two men who were present at the hospital with the minor to be the Defendant and co-defendant Riley. The minor told hospital staff she was having sex with up to fifteen men a day in exchange for money and drugs.

Based on the information provided to HPD regarding the minor, HPD obtained a search warrant on May 7, 2021, for Room 260 at the Days Inn, which was registered to Riley, to search for the minor and evidence of prostitution and drug distribution. During the execution of the search warrant, officers located Riley inside the room with several other people. The minor was not located.

Agents with Homeland Security Investigations (HSI) and the South Carolina Law Enforcement Division (SLED) then located and interviewed an individual law enforcement had observed during surveillance driving a young female away from the Days Inn prior to the execution of the warrant. That individual confirmed the young female he left the Days Inn with was the minor and he had driven her to the Red Roof Inn, located in Yemassee, South Carolina, where she was staying in Room 122. Law enforcement responded to Room 122 at the Red Roof Inn in Yemassee, located the minor, and safely turned her over to the care of the South Carolina Department of Social Services. At the time the minor was taken into protective custody, she was emaciated and heavily addicted to crack cocaine and fentanyl. As a result, she had to be admitted to the Medical University of South Carolina.

Upon further investigation, officers confirmed Room 122 at the Red Roof Inn was also registered to Riley. A review of security video of the back entrance of the Red Roof Inn showed the minor with a black male and white male, later identified by the minor to be Riley and the Defendant, a day or two prior to her being placed in the care of the South Carolina Department of Social Services on May 7, 2021.[2]

During the investigation, the cellphones of both the minor and Riley were seized as evidence and state search warrants were obtained to extract the contents. HSI used the cellphone number for the minor provided by the human trafficking tip line to search commercial sex ads on Spotlight.[3] A search of the number yielded sixty-two commercial sex ads posted between November 7, 2020, and March 1, 2021, in various locations throughout South Carolina and once in Georgia. The ads had various images of a female, which the minor confirmed were her in later forensic interviews, posing in lingerie.

Minor's First Forensic Interview – May 20, 2021

The minor's first forensic interview occurred less than two weeks after she was taken into protective custody and very early in her recovery process. During the interview, she provided historical information about her life, her family, and how she ended up in Hardeeville, South Carolina. She told the interviewer she felt "lost" and her life was a mess. She admitted to prostitution and drug use but deflected other people's involvement in her actions. She admitted

---

[2] The minor told officers she had been staying at the Red Roof Inn since May 5, 2021. Employees of the Red Roof Inn advised law enforcement the hotel had lost power a few days prior to May 7, 2021, which had caused the date and time stamp on the security footage to be inaccurate. From viewing the footage, law enforcement believed the date stamp to be off by two days, but because of the power outage, the exact date and time could not be determined.

[3] Spotlight is web-based application that captures and stores commercial sex ads for law enforcement to use in sex trafficking investigations.

she told the hospital staff she was selling herself but denied telling them she was being trafficked. She referred to the Defendant as a "father figure" and said he helped her out financially and never asked her for sexual favors. She talked about her love for her mom and her desire to be reunited with her. The interview lasted approximately forty-five minutes, which included her individually meeting the members of the investigative team. She was asked very few questions, as the intent of the first interview was for the minor and interviewer to get to know each other.

Minor's Second Forensic Interview – July 2, 2021

During the second forensic interview, which lasted a little over two hours, the minor stated at age sixteen she got involved with a twenty-five-year-old male named "Tyler" and that Tyler introduced her to heroin. During their relationship, Tyler took her to a "crack house" where she met co-defendant Mills, who was around twenty-nine years old at the time. The minor said she used "crack" for the first time with Mills and knew Mills prostituted to pay for her drug use. She further explained that while driving in a car with Tyler and Mills one night, Mills asked Tyler to take her to meet a commercial sex client and that Mills told the minor there were two customers if the minor wanted to participate. The minor agreed; she said they made $300 each and she decided to keep doing it because of how much money she was able to make. The minor explained how the ads were posted by Mills on "Skip the Games" and how her commercial sex business with Mills operated before she eventually began doing it all on her own.

As to Riley, the minor explained he was a drug dealer that found her in a hotel room when she was in a bad situation, and he told her to stay in his room. They began a romantic relationship; however, Riley was verbally abusive, putting her down and calling her hurtful names. The minor further explained Riley did not have to work and benefitted financially from her prostitution.

The minor then explained how the Defendant came into her life and the role he played. She said she met the Defendant, whom she referred to as "Earl" during the interview, shortly after her seventeenth birthday through Mills. The Defendant used to be Mills' "sugar daddy," but they had a "falling out." After the Defendant and Mills' "falling out," the Defendant contacted the minor through "Skip the Games." At their first meeting, the Defendant paid the minor $300 to give her an oil massage. The Defendant told the minor he could get her a hotel room and she would not have to worry about anything. The Defendant would meet with the minor on an almost daily basis and she would usually perform oral sex on him. Sometimes, the Defendant would give the minor money, and she would not have to do anything sexual with him. However, eventually the Defendant told the minor he would not give her any more money if they could not have sex. The minor was uncomfortable, however she felt obligated to have sex with the Defendant, so she did "to get it over with". The minor explained they only had vaginal sex twice, however the Defendant wanted it constantly. It got to the point where the minor would do anything she could to avoid having to have any sort of sexual contact with the Defendant, however the Defendant told her he would not give her any more money if she was not going to give him what he wanted in return, so she said she "would do what I have to do, if I have to."

The minor explained the Defendant gave her cash, provided her crack cocaine, paid off her drug debts, and occasionally paid for the minor and Riley's hotel rooms. The Defendant was allowed to be with other girls, but he did not want her with any other men, saying "it's me or all the other guys." She admitted the Defendant was her "sugar daddy" and that it made her uncomfortable to say that she had one. She explained that even though she had been referring to the Defendant as "Earl" in the interview, she always called him "Chuck" because he was from Charleston. She also admitted to "blackmailing" the Defendant for $4,000.00 and spending the

money all in one day on drugs. The minor said the Defendant told her he had spent $38,000 on drugs for her since they met.

As to her age, the minor explained the Defendant knew she was only seventeen years old because she told him.[4] She admitted to telling him she was nineteen the first night they were together but said that he knew she was only seventeen because Mills had told him.[5] She then identified pictures of herself in the Defendant's home in Charleston, as well as his home in Beaufort, and she explained that most of the commercial sex between her and the Defendant occurred at the Defendant's home in Beaufort. The minor also explained the Defendant gained access to her social media accounts and would read her messages and respond without her

---

[4] While there is evidence in this case showing the Defendant knew the minor was only seventeen years old, it is important to note that knowledge is not required if the Defendant had a reasonable opportunity to view the minor – which the Defendant undoubtedly did. *See* 18 U.S.C. §1591(a)(1)*; United States v. Chapman*, 589 Fed. App'x 159, 160 (4th Cir. 2015) (unpublished); *United States v. Rooke*, 583 Fed. App'x 136, 137 (4th Cir. 2014); *United States v. Duong*, 848 F.3d 928, 934 (10th Cir. 2017); *United States v. Robinson,* 702 F.3d 22, 32 (2d Cir. 2012). The reasonable opportunity to observe prong relieves the government of proving actual knowledge or reckless disregard of the minor's age.  Thus, if the United States proves there was a reasonable opportunity to observe, the United States need not show the defendant later learned and disregarded the minor's true age.  *See, e.g., Robinson*, 702 F.3d at 31-33; *United States v. Booker*, 447 Fed. App'x 726, 727 (7th Cir. 2011); *Duong*, 848 F.3d at 934; *United States v. Copeland*, 820 F.3d 809, 813 (5th Cir. 2016).  Moreover, courts have found a reasonable opportunity to observe victims in cases where the defendants had far less access to the victims than the Defendant did in this case.  *See, e.g., United States v. Davis*, 711 Fed. App'x 254, 258 (6th Cir. 2017); *United States v. Blake,* 868 F.3d 960, 975-76 (11th Cir. 2017).

[5] The Defendant also attempts to argue that the minor's misrepresentation of her age somehow negates the Defendant's guilt, which is inaccurate and contrary to law. Multiple courts have found sufficient evidence to support convictions for sex trafficking of minors, even when the minors misrepresented their ages to others.  *See, e.g., Robinson*, 702 F.3d at 34-35   (finding sufficient evidence to support conviction even though the victim "told everyone" including the defendant and police she was 19 years old and a hotel employee thought the victim looked 21 or 22 years old); *United States v. Davis*, 711 Fed. App'x 245, 254-258 (6th Cir. 2017) (finding sufficient evidence to sustain conviction even though victim allegedly told the defendant she was 19 years old and provided police several fake names and dates of birth).

knowledge to men that were messaging her. The Defendant later admitted to her he was on her account controlling it but did not stop, so she deleted her social media accounts.

The minor stated when the Defendant paid for the hotel rooms, he would put the rooms in Riley's name because the minor was underage and could not have a room in her name, unless the hotel room was for her and the Defendant, in which case the Defendant put the room in his name. She preferred to meet the Defendant at hotels instead of his home in Beaufort because it was easier for her to get away when she wanted to if she was at the hotel.

The minor explained that at one point during the Defendant's involvement with the minor victim, the Defendant set up an account on "Seeking Arrangements," another commercial sex website, using the minor's photo in an attempt to get her "big money plays." The Defendant would text with interested males pretending to be the minor to try and arrange more lucrative commercial sex business for her. The minor never met with any of the men and asked the Defendant to take down the profile but was unsure if he ever did. The minor explained that when she and the Defendant first starting meeting together, she denied being with other men, even though she was. She stated the Defendant found out about the other men and advised her she could do better and her prices for commercial sex were too low. The Defendant controlled the "Seeking Arrangements" account; the minor never saw it, did not know how to access it, and never saw the communications between the Defendant and any potential clients.

The minor stated the Defendant made videos on his "secret" iPhone 6 of her performing oral sex on him at the Days Inn Motel. The Defendant had two phones, one his wife knew about and then the iPhone 6. She explained the Defendant liked taking pictures of her naked and that she saw photos of herself taken by the Defendant on his phone and she sent some of them to her phone.

Minor's Third Forensic Interview – August 12, 2021

During the third forensic interview, which last approximately an hour, the minor was shown several photos and asked to identify who was in the photos and what was taking place in them. She was shown a series of photos of her posing in lingerie with a male and female in a hotel room. She confirmed it was her posing in the lingerie, identified the other female as Mills and the male as the Defendant, and stated that the room was at a hotel in Charleston. Several of the photos taken at that time were later used in ads posted on "Skip the Game." The minor performed oral sex on the Defendant and then he gave her an oil massage in that hotel room.

She was then shown a photograph she had previously identified in her second forensic interview that showed her, topless but covering her breasts, at the Defendant's home in Beaufort. She stated she performed oral sex on the Defendant during that trip and he gave her an oil massage. The next set of photos showed her in a hotel room with the Defendant.  The minor explained that when she did not want to go to the Defendant's house in Beaufort, she would ask him to get a room at the Best Western in Hardeeville where they could conduct their commercial sex business then she could return to the Days Inn down the road. [6]

The minor stated the first time she had vaginal sex with the Defendant was at the Days Inn and the second time occurred at his home in Beaufort. After they did "business," the Defendant would always giver her cash, but he used a money transfer app called "CashApp" to send her money to pay for drugs. She also identified a photo of herself from a Red Roof Inn in Charleston where she and Mills performed commercial sex on an unidentified male while the Defendant and Riley waited for them outside in the car. The Defendant paid for the room and put it in Riley's

---

[6] Based on the date of the photos, the investigative team found a receipt from the Best Western in Hardeeville for that date showing where the Defendant rented a room for two people, in his name with a phone number and address associated with him.

name. She furthered explained how her and the Defendant's "relationship" worked. She said the Defendant was confusing because he did not want her to see other guys but wanted her to make more money. If she saw other guys, she would have to hide it from him because he would threaten to cut her off. The minor brought back up the account the Defendant created with her photo on "Seeking Arrangements" and how he controlled the conversation, but she stated that she never met with any clients from those ads.

Searches of the Defendant's iPhone 11 and Facebook and iCloud Accounts

As part of the investigation, HSI placed a notification alert in both Customs and Border Protection (CBP) and Immigration and Customs Enforcement (ICE) databases to be alerted should the Defendant leave and/or re-enter the United States. HSI received an alert on May 28, 2021, that the Defendant was flying to the Bahamas on May 30, 2021. On June 2, 2021, HSI agents located in Daytona, Florida, extracted the contents of the Defendant's iPhone 11 Pro Max and iPad at the Daytona Beach International Airport upon the Defendant's return from the Bahamas. The devices were returned to the Defendant and the extraction was sent to HSI Charleston for review.

A review of the minor, Riley, and Defendant's cellphone extractions revealed a significant number of communications in Facebook Messenger, as well as recorded messages, between the Defendant, co-defendants, and the minor. These communications corroborated the information provided by the minor in her second and third forensic interviews. In the conversations, the Defendant admitted to knowing the minor was only seventeen years old; coerced her to have vaginal sex with him and guilted her for her refusal; admitted to numerous occasions of oral sex with the minor; detailed how much he spent on her for commercial sex, her drugs and hotel rooms; and had various other conversations establishing the Defendant's role in trafficking the minor for sex.

Based on the statements of the minor and other evidence discovered during the investigation, including evidence from the extractions of the minor, Riley, and the Defendant's cellphones, search warrants were obtained for the Defendant's Facebook account on August 11, 2021, and iCloud accounts on August 27, 2021. On the Defendant's iCloud account, HSI agents discovered videos of the minor performing oral sex on the Defendant from December 2020, consistent with the minor's statements.[7] There were also two videos found where the Defendant had recorded the minor engaging in commercial sex with two unidentified Hispanic males.

<u>Video of Minor Engaged in a Commercial Sex Act</u>

In the video the Defendant has taken issue within his filings, the minor victim can be seen when the video first turns on adjusting the camera. She then goes off camera. A young, white female of similar build with similar hair color and wearing similar black leggings comes on screen and the Defendant can be seen adjusting the shirt of the young female while saying something to the effect of "let them see you like this." The Defendant's face cannot be seen on the video and the young female's face is only seen briefly as a side profile, but because of the lighting and quality of the video, she cannot be readily identified. The young female then goes off camera. As the video continues, it shows the minor victim, along with Riley, arranging commercial sex with an unidentified Hispanic male. The video then records the events between the minor victim and Hispanic male, with the two going back and forth between what appears to be the bathroom and

---

[7] Despite the minor victim's statements that the Defendant knew her age, defense counsel attempts to argue there is no evidence showing the Defendant knew the minor was only seventeen years old when the child pornography videos were made. But under established Fourth Circuit precedent, knowledge of the victim's age is neither an element of a production of child pornography offense nor textually available as an affirmative defense. *See United States v. Malloy*, 568 F.3d 166, 171, 173 (4th Cir. 2009). There is no "reasonable mistake of age" defense to a production of child pornography charge. *Id.*

the bedroom. When the commercial sex act is completed, the Defendant, along with co-defendant Riley, re-enters the hotel room to assist in getting the Hispanic male to leave.

In viewing the video, agents believed the young female whose shirt the Defendant adjusted was the minor because it was not immediately obvious there were two different girls. The two girls are never on screen at the same time and the minor was identified in the beginning and at various other parts in the video. In addition to the two girls both being the same race with similar hair color and similar build, the only female voice heard and recognized was the minor's. The television was also playing in the background the whole time with various people talking.

Indictment and Detention Hearings

On October 13, 2021, based on all the above evidence and information obtained from an almost six-month long investigation, the grand jury issued a superseding indictment in *United States v. Riley, et al*., charging the Defendant with conspiracy to traffic a minor for sex (18 U.S.C. § 1594(c)), trafficking a minor for sex (18 U.S.C. § 1591(a)(1)), and three counts of production of child pornography (18 U.S.C. § 2251(a)).  Riley and Mills were also charged in the indictment for conspiracy to traffic a minor for sex (18 U.S.C. § 1594(c)) and trafficking a minor for sex (18 U.S.C. § 1591(a)(1)). The Government moved for detention and all three defendants were ordered detained.

At the detention hearings for the Defendant, the Government presented an abundance of evidence proving the Defendant's danger to the community, including but not limited to, the background of the case; the statements made by the minor detailing the Defendant's role in her trafficking; sample written and recorded messages between the Defendant, the minor, and co-defendants that detailed the Defendant's knowledge of the minor's age and the commercial sex relationship he had with her; edited samplings and descriptions of the child pornography and other

11

videos found on the Defendant's iCloud account; and messages the Defendant sent to other people after the minor was taken in to protective custody seeking other young girls for commercial sex.

Mills' First Proffer – December 20, 2021

After discovery was produced on December 8, 2021, Mills agreed to proffer.[8] During the proffer, Mills said she told the Defendant the minor's age "off the top" and that she confronted him for being with a child. She remembered she and the Defendant had an argument in November 2020 and the Defendant knew the minor's age around December 2020. The first time Mills found out about the Defendant and the minor being together was when minor was overdosing and Mills messaged her, at which time the minor told Mills she was dealing with the Defendant. The minor would ask Mills to go on the trips with her and the Defendant because the minor was not comfortable being alone with the Defendant. Mills would agree to accompany the minor because she was a young child, and they had many arguments about her age. Mills stated the Defendant did not want Mills around him and the minor because the minor would not "do what she normally would" when Mills was around.

Mills was shown clips from the two videos found on the Defendant's "chucktown" iCloud account of the minor engaging in commercial sex with two unidentified Hispanic males and asked if she could identify the people in the video. Mills identified the minor and the Defendant in both videos but advised she did not think the young female whose shirt the Defendant adjusted was the minor. Mills also advised she used to use crack cocaine with the minor and the minor's mother and the minor's mother knew the minor was prostituting herself in Hardeeville.[9]

---

[8] See the Government's Response to the Defendant's Motion to Compel Evidence for a detailed factual summary regarding the production of discovery.

[9] Defense counsel inaccurately states that the minor's mother introduced the minor to crack cocaine and prostitution. While Mills and Riley say the minor would use crack cocaine with her mother,

Riley's Proffer – February 2, 2022

As to the Defendant and his involvement with the minor, Riley explained the Defendant had a falling out with Mills and transitioned to the minor and that he met the Defendant through Mills and the minor. Riley had a good relationship with the Defendant at first, then it got "rocky" because the Defendant was buying drugs for the minor and controlling her. He stated that the Defendant was possessive of the minor. Riley believed the Defendant wanted Riley out of the picture so the Defendant could have the minor to himself and that the Defendant was using the minor to "promote" himself, being an older man with a young female. Riley felt he could not compete with the Defendant because of the Defendant's financial wealth. He said the Defendant would give the money earned by the minor to Riley so Riley could "keep the money straight." Riley stated the Defendant would talk about getting the minor off drugs but was still buying large amounts of drugs for her at the same time. Riley discussed the minor "blackmailing" the Defendant and said the minor did so because of something the Defendant had done to the minor. Riley said the minor spent some of the $4,000 but $2,000.00 to $3,000.00 was returned to the Defendant.

Riley was also shown clips from the two videos found on the Defendant's "chucktown" iCloud account of the minor engaging in commercial sex with two unidentified Hispanic males and asked if he could identify the people in the video. Riley identified the minor and the Defendant in both videos but advised he did not think the young female whose shirt the Defendant adjusted was the minor and he thought it could be Mills.

---

no one ever stated the minor's mother introduced her to prostitution, nor is there any other evidence supporting that statement.

Review of Video of Minor Engaged in a Commercial Sex Act

Based on both Mills' and Riley's statements, HSI agents went back and carefully reviewed the video with the Defendant adjusting the shirt of the young female in order determine whether it was in fact a different female. The video showed a female with pink hair up, thought to be the minor, wearing a gray sweatshirt with pink letters and black leggings. The female identified as the minor had pink-reddish hair down and was wearing a black and white shirt with black leggings. During the review of the video, it was determined that the unidentified female in the gray sweatshirt walked left off screen at approximately three minutes into the video toward the door and was not seen again during the remaining video. It was confirmed again the female involved in the commercial sex act with the unidentified Hispanic male was the minor. This updated information was provided to the Government, at which time the Government emailed the Defendant's counsel to inform them of the new information regarding the video.

Mills' Second Proffer – March 18, 2022

During Mills' second proffer, she provided additional information regarding the Defendant's knowledge of the minor's age, reiterating the Defendant knew "from the jump," meaning the beginning. She added that when she and the Defendant argued about the minor, the Defendant would say things like "she is too young" and that he wanted to make sure the minor is growing up the right way.

On June 6, 2022, the Defendant filed a motion to compel the Government to disclose the transcript of the Grand Jury presentation in his case, arguing disclosure is proper pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i)-(ii), *Brady*,[10] *Giglio*,[11] and the Due Process Clause of the Constitution.

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

[11] *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Claiming he has demonstrated a particularized need for disclosure to avoid injustice in any further judicial proceedings because the requested proceedings likely establish grounds for dismissal of the indictment and constitute impeachment material as to one or more Government witnesses pursuant to *Brady*.

## **STANDARD**

Rule 6(e)(2)(B) of the Federal Rules of Criminal Procedure prohibits certain persons, including prosecutors, from disclosing "matters occurring before the grand jury." The "indispensable secrecy of grand jury proceedings must not be broken except where there is a compelling necessity." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958) (citations omitted). The district court overseeing a grand jury may waive Rule 6(e)'s secrecy requirement if the movant establishes a "particularized need" for certain grand jury information. *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979). Under that standard, the movant must demonstrate that:

> the material sought is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that [the] request is structured to cover only material so needed.... [Moreover], in considering the effects of disclosure of grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries.

*Id.*; *see also United States v. Moussaoui*, 483 F.3d 220, 235 (4th Cir. 2007). The party seeking disclosure has the burden of proof to establish the "particularized need." *Id.*

## **ANALYSIS**

It appears the Defendant has three reasons for requesting the Court to order the Government to produce the grand jury transcript of Agent Hawsey's testimony: (1) the matter occurring before the Grand Jury may support and/or constitute grounds for a Motion to Dismiss the Indictment; (2) the information is critical for him to adequately prepare for trial; and (3) the information may

provide impeachment evidence of a Government witness and an attack upon the investigation conducted by the Government.[12] For the reasons below, the Government does not believe the Defendant's motion articulates a sufficient particularized need to compel the disclosure of the grand jury testimony.

**A. The Defendant has not shown that a ground may exist to dismiss the indictment.**

Under Rule 6(e)(3)(E)(ii), a court may allow the disclosure of matters occurring before a grand jury "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." However, "this provision is not an invitation to engage in a fishing expedition to search for grand jury wrongdoing and abuse when there are no grounds to believe that any wrongdoing or abuse has occurred." *United States v. Loc Tien Nguyen*, 314 F. Supp. 2d 612, 616 (E.D. Va. 2004); *see also United States v. Ferreboeuf*, 632 F.2d 832, 835 (9th Cir. 1980) (speculation of impropriety based on alleged insufficient length of grand jury consideration was insufficient to require disclosure). A strong presumption of regularity attaches to grand jury proceedings. *See United States v. Capozzi*, 486 F.3d 711, 726-27 (1st Cir. 2007) (upholding trial court decision denying defense motion to examine transcripts for alleged failure to establish an element of the charge). As such, "a defendant seeking disclosure of grand jury information under Rule 6(e)(3)(E)(ii) bears the heavy burden of establishing that particularized and factually based grounds exist to support the proposition that

---

[12] To the extent the Defendant's motion includes the production of statements of an Assistant United States Attorney or Special Assistant United States Attorney to the grand jury, no controlling authority supports this request. While the grand jury testimony of a witness is required to be produced after the witness testifies under the Jencks Act if the moving party can articulate a "particularized need," 18 U.S.C. § 3500, no such requirement applies to the lawyer's statements. The Defendant fails to cite any law that would support a request to compel production of the Government's statements. This broad and extraneous request is a far cry from a "limited" disclosure. *Procter & Gamble Co.*, 356 U.S. at 681.

irregularities in the grand jury proceedings may create a basis for dismissal of the indictment." *Loc Tien Nguyen*, 314 F. Supp. 2d at 616 (quoting *United States v. Abcasis*, 785 F.Supp. 1113, 1119 (E.D.N.Y. 1992)) (internal quotations omitted); *see also United States v. Breitkreutz*, 977 F.2d 214, 217 (6th Cir. 1992); *United States v. McKie*, 831 F.2d 819, 821 (8th Cir. 1987); *United States v. Lisinski*, 728 F.2d 887, 893 (7th Cir.1984), *cert. denied*, 469 U.S. 832 (1984).

"The dismissal of an indictment is only warranted if the violation resulted in prejudice to the defendant." *United States v. Outlaw*, 464 F. App'x 165, 167 (4th Cir. 2012) (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). "Such prejudice may be shown only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* (internal quotation omitted). However, "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment." *Id.* (internal citations omitted).

The Defendant's motion sets forth no possible grounds on which the indictment may be set aside. Nor does it identify any basis for this Court to believe that a matter that occurred before the grand jury might support a motion to dismiss. The only evidence the Defendant attempts to present as a sufficient particularized need under Rule 6(e)(3)(E)(ii) is the Government's discovery, several months after indictment, that one of the females identified in one of the videos as the minor was not the minor. As thoroughly detailed above, the video in question showed the Defendant adjusting the shirt of a young female and saying "let them see you like this" before capturing the minor participating in commercial sex with an unidentified Hispanic male. Because the minor is positively identified in the beginning of the video and as the one participating in the commercial sex, agents who viewed the video believed the young female whose shirt the Defendant adjusted was the minor as well.

The Defendant cannot show that this one single fact substantially influenced the grand jury's decision to indict or creates a grave doubt that the decision to indict was not free from the substantial influence of the mistaken identity. In fact, such an argument seems rather absurd considering the overwhelming amount of evidence against the Defendant in this case.[13]

The Defendant's action in that particular video is but one piece out of an *abundance* of evidence proving the defendant's participation in the trafficking of the minor victim for commercial sex and production of child pornography, including, but not limited to, detailed and disturbing written messages the Defendant sent to the minor about their commercial sex relationship; recorded messages; pictures; statements made by the minor victim; and videos the Defendant recorded of the minor victim performing oral sex on him.

The basis for the Defendant's argument, that it was relied on to show the Defendant's "control" over the minor, is not even an element of the offenses the Government is required to prove. Evidence of force, fraud, and coercion is not required when the trafficking involves a minor.[14] Any arguments regarding "consent" are also misplaced. Consent by a minor is not a

---

[13] Additionally, any testimony provided regarding the identity of the young female as the minor was done with a good-faith belief that she was in fact the minor. The Defendant has not and cannot produce any evidence showing agents for the Government intentionally misled anyone about the identity of the young girl in the video.

[14] Section 1591(a)(1) of Title 18 reads in relevant part, "Whoever knowingly, in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; knowing, or, in reckless disregard of the fact, that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b). Section (c) states, in a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, or solicited, the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years."

defense as a minor cannot consent to be sexually exploited. *See United States v. Robinson*, 508 F. App'x 867 (11th Cir. 2013) (unpublished) (minors cannot consent to engage in prostitution); *United States v. Raplinger*, 555 F.3d 687, 691–92 (8th Cir. 2009) (consent is not a defense to child pornography charges); *United States v. Dhingra*, 371 F.3d 557, 565, 567 (9th Cir. 2004) (consent not a defense to charges of soliciting a minor in violation of 18 U.S.C. § 2422(b)).

The Defendant's argument therefore fails to satisfy his heavy burden of establishing that a particularized and factually-based ground exists to support his proposition that irregularities in the grand jury proceedings may have created a basis for dismissal of the indictment.  Instead, he has just put forth an overreaching argument about the competency of one piece of evidence, which as the Supreme Court explains in *Costello v. United States*, 350 U.S. 359, 363-64, is not enough:

> If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more.

The Defendant has not met his burden of showing the grand jury transcript must be produced because a ground may exist to dismiss the indictment.

**B.  General trial preparation is not a "particularized need."**

Pointing to no other direct evidence related to this case, the Defendant next attempts to establish a particularized need by making the generalized assertion that he needs the grand jury transcript to prepare for trial. This fails to meet his heavy burden. General trial preparation is a far cry from meeting the Defendant's burden of establishing a "particularized need" to pierce the veil of grand jury secrecy. "A defendant is not entitled of right to pre-trial access to the testimony

before the grand jury: The obligation of the Government is merely to make available to the defendant the testimony of a witness before the grand jury at the conclusion of the direct testimony of such witness at trial and then only if the defendant shows a 'particularized need' for such disclosure." *United States v. Anderson*, 481 F.2d 685, 692 (4th Cir. 1973), *aff'd*, 417 U.S. 211 (1974).

To support his position that general trial preparation qualifies as a "particularized need," the Defendant cites a dissenting opinion by Justice Brennan wherein he provides examples of when Grand Jury testimony could be turned over, such as inconsistency between trial and Grand Jury testimony and when the Government uses the Grand Jury testimony to refresh recollection or impeach a witness – neither of which are applicable to this case. The Defendant also references *Gordon v. United States*, 344 U.S. 414 (1953), to further support his position that he is entitled to any evidence of possible contradictory testimony. However, *Gordon* involved prior inconsistent statements made by a testifying co-defendant during the investigation, *not* Grand Jury testimony, and again, only became relevant after the testimony of the witness at trial.[15] The Defendant fails to cite any persuasive case law to support his position that general trial preparation qualifies as a sufficient "particularized need" to justify disclosure of Grand Jury testimony. As such, the Defendant has not met his burden of proof.

---

[15] "On cross-examination, Marshall admitted that between his apprehension and his final statement to the Government, which implicated petitioners, he had made three or four statements which did not. Petitioners requested the trial judge to order the Government to produce these earlier statements." *Gordon v. United States*, 344 U.S. 414, 416 (1953).

**C. Mere speculation of possible impeachment evidence and the desire to seek out evidence to attack the Government's investigation do not constitute a sufficient "particularized need."**

A general plea to review grand jury testimony for impeachment material is also insufficient to require disclosure. *United States v. Harbin*, 585 F.2d 904, 907 (8th Cir. 1978) (citing *Hanger v. United States*, 398 F.2d 91, 97 (8th Cir. 1968), *cert. denied*, 393 U.S. 1119 (1969)). The Fourth Circuit has specifically held that such requests are improper grounds to overcome the grand jury's protections. *See, e.g.*, *United States v. Chase*, 372 F.2d 453, 466 (4th Cir. 1967) ("[T]he mere possibility that [a witness's] testimony before a grand jury differed from his testimony at trial [ ] would be insufficient reason to pierce the veil of secrecy which protects the proceedings of such a body.") Where production of grand jury minutes is sought on the basis that they are needed for impeachment purposes or to test the credibility of a witness, the proper time for such a motion is at the time the witness testifies at trial, upon a showing of particularized need for inspection. *Hanger*, 398 F.2d at 97.

Furthermore, the Defendant's assertion that he needs the Grand Jury transcript to seek out "evidence to attack the Government's investigation" is specifically the type of request, or "fishing expedition," the "particularized need" rule seeks to prevent. *See Gilbert v. United States*, 203 F.3d 820, 2000 WL 20581, at *6 (4th Cir. 2000) (Table) (requests for access to grand jury materials "must amount to more than a request for authorization to engage in a fishing expedition" (quoting *In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997)); *United States v. Adams*, No. 3:08-CR-77, 2011 WL 13161193, at *15 (N.D. W. Va. Feb. 23, 2011) (finding defendant's request to access Grand Jury materials to "meaningfully assess grounds for challenging the collection" of evidence in his case was an improper "fishing expedition" and not a sufficient "particularized need"). The Defendant's motion is improper at this time and should be denied.

21

## **CONCLUSION**

All of the Defendant's attempts to establish a "particularized need" for the Grand Jury transcript in this case fall short of proof that without the transcript his defense would be greatly prejudiced or that without reference to it an injustice would be done. *Procter & Gamble Co.*, 356 U.S. at 682. Instead, the defense assumes a system where defendants are entitled to look for an "out" on a technicality before the grand jury as a matter of course, a concept the Supreme Court in *Costello* definitively rejected:

> Petitioner urges that this Court should exercise its power to supervise the administration of justice in federal courts and establish a rule permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence. No persuasive reasons are advanced for establishing such a rule. It would run counter to the whole history of the grand jury institution, in which laymen conduct their inquiries unfettered by technical rules. Neither justice nor the concept of a fair trial requires such a change. In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

350 U.S. at 363-64. As such, the Defendant has failed to meet his burden. His motion to compel should be denied.

Respectfully submitted,

COREY F. ELLIS
UNITED STATES ATTORNEY

By: *s/ Carra Henderson*
Carra Henderson
Special Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
(843) 266-1644

June 27, 2022